# EXHIBIT A



# OFFICE OF THE PUBLIC DEFENDER
# COUNTY OF DELAWARE

**220 NORTH JACKSON STREET
MEDIA, PENNSYLVANIA 19063**

OFFICE (610) 891-4100   FAX (610) 892-0865

CHRISTOPHER WELSH
DEFENDER

LEE AWBREY
FIRST ASSISTANT

March 12, 2021

Secretary Teresa D. Miller
Department of Human Services
Commonwealth of Pennsylvania

> **Re:   Delaware County Juvenile Detention Center
> 370 Middletown Road, Lima PA, 19037**

We are writing in our capacity as Chief and First Assistant of the Delaware County Office of the Public Defender to share grave concerns about the health, safety and well-being of the children in custody at the Delaware County Juvenile Detention Center in Lima ("DCJDC"). Over the last month, through interviews with our clients and interviews with current and former DCJDC staff, our office has uncovered multiple credible allegations of physical, sexual, and mental abuse perpetrated by the DCJDC staff against children held in their custody, where a disproportionate number of residents are children of color. Those with whom we spoke also described inadequate facilities, substandard medical and mental health care, deficient education services, and a culture that fosters secrecy at the expense of the safety of children.

As the agency that licenses, oversees, and regulates DCJDC, we request that the Department of Human Services conduct a full investigation into these allegations. You must act now to ensure that more of our children are not abused by those tasked with their care, rehabilitation, and protection.

## Physical, Sexual, and Psychological Abuse by Staff

Our office received accounts of children that suffered from physical, sexual and psychological abuse at the hands of the DCJDC staff. Some of those accounts are contained in the attached affidavits. We have already been in communication with law enforcement regarding a serious allegation of sexual abuse. We are prepared to disclose additional information to the appropriate investigative agency in accordance with the law. The affidavits attached to this letter contain allegations of physical abuse. A clinical case worker tells of an incident in which a staff member slammed a young teen's head into a window lined with metal wire mesh—the force cracked the reinforced window. Aff'd N.O. at ¶ 7. He also describes an incident in which a child reported being shoved and hit by a staff member. *Id.* at ¶ 8.  A different counselor describes an incident in which a staff member punched a child in the face (Aff'd H.H. at ¶ 13) and another incident in which a supervisor violently shoved a child into a wall while staff watched on. *Id.* at ¶ 14. We have heard accounts of guards using extreme amounts of force to restrain, unchecked by

supervisors. A former resident described being put in chokeholds that almost caused him to lose consciousness at least twice. A non-resident recalled fearing for a child's life when they watched a guard throw a youth against a wall in a violent chokehold.

A mental health clinician recently witnessed a guard grab a pregnant teen by the shoulders and scream in her face. She fell and he "stepped over her in a menacing posture as she lay on the ground" and continued screaming at her. Aff'd N.U. at ¶ 5. That same week the clinician received credible reports from residents that a guard spoke of an intent to restrain the same pregnant teen in a manner that would induce a miscarriage. *Id.* at ¶ 6.

Another report describes an incident where a child with severe mental illness tried to asphyxiate herself by swallowing clothing. After staff intervened and cleared the clothes, the girl was thirsty and asked for water. "Three staff members took her to a toilet, stuck her head in the bowl, and forced her to drink from it." Aff'd. H.H. at ¶ 12. A different clinical caseworker reports repeated heated discussions with staff about refusal to follow suicide protocols. Aff'd N.O. at ¶ 9. In one incident described to us, a guard bragged to others that she punched a resident in the face and "fucked her up." One guard held the child down while the other repeatedly punched her, resulting in marks on her face and a black eye. The injury was observed by others working on site.

In addition to physical abuse, verbal threats are pervasive. An affiant saw a supervisor "storm toward a child, get in his face, and threaten, 'I'll see you on the street. I'll beat you up. I'll take care of it." Aff'd. H.H. at ¶ 15. The former Lead Clinician at the facility was present when a child reported to DCJDC supervisors that an overnight worker threatened him on multiple occasions that he was going to "fuck you up" and "fuck [his] mom." Aff'd O.R. at ¶ 15. Affiants report staff calling youth "bitch" (Aff'd N.U. at ¶ 8; Aff'd. O.R. at ¶ 14) and "faggot" (Aff'd N.U. at ¶ 9). One staff member told us that detention officers threaten to beat children and lock them in their rooms all day. The verbal abuse and threats are frequently racist, misogynistic or offensive to LGBTQ youth. A staff member fearing retaliation recalled incidents in which staff said "Fuck you, pussy!" and "Suck my dick, bitch!"[1]

Staff allegedly attack gender, religious, racial, linguistic, and identity status when bullying children. Staff put a child into seclusion as punishment for wearing a Muslim hijab where staff objected to its color. Aff'd O.R. at ¶ 28.  Staff refused to believe that a Spanish-speaking child could not understand English and addressed the language barrier by yelling at the child in English. Aff'd N.O. at ¶ 13. A former resident recalled watching a guard yell at a boy unprovoked and call him the N-word. Former female juvenile residents disclosed to us that they inappropriately received messages from male staff after leaving the facility. *See, e.g.,* Aff'd H.H. at ¶ 17. And, when charged with the custody of transgender youth, staff refused to use preferred pronouns, denied a transgender youth the ability to wear a wig, did not permit a transgender girl to shave facial hair, outed a child as transgender to other residents, and did not continue her hormone

---

[1] Troubling on their own, these reports are exponentially offensive in light of the reality that youth placed in residential settings are more likely to have experienced previous trauma such as physical, sexual, or emotional abuse; domestic or community violence; traumatic loss; or having an impaired caregiver. Additionally, youth of color, LGBTQ and gender expansive youth, and youth in foster care are disproportionately committed to residential institutions when compared to their peers, with Black and Latinx children being twice as likely as White children to be placed in these institutions. *See* https://www.inquirer.com/crime/a/glen-mills-schools-pa-abuse-juvenile-investigation-20190220.html; https://www.inquirer.com/philly/news/pennsylvania/philadelphia/Death-rape-Philadelphia-Wordsworth-residential-treatment-center-troubled-youth-gallery.html

treatment or allow her to live on a unit consistent with her gender identity. *See* Aff'd O.R. at ¶ 27 and Aff'd H.H. at ¶ 28.

### Excessive, Unjustified, and Prolonged Isolation

Youth detained at DCJDC are subjected to prolonged isolation as a form of punishment, sometimes for days or weeks.[2] Many of these children have documented histories of trauma and childhood victimization, and many are diagnosed with mental, emotional, and/or developmental disabilities.

According to the American Psychological Association, solitary confinement practices, similar to the DCJDC isolation practices, are harmful, increase risks of self-mutilation and suicidal ideation, exacerbate the onset of pre-existing mental illness and trauma symptoms, and lead to greater anxiety, depression, sleep disturbances, paranoia, aggression and an increased risk of cardio vascular problems.[3] While Pennsylvania law does permit facilities to utilize seclusion under strict supervision, for limited periods of time, the DCJDC isolation practices described by the affiants and multiple additional witnesses violate the law. *See* 55 Pa. Code 300.274(17) (defining the requirements that apply to use of seclusion).[4] Juvenile detention facilities cannot isolate children for days at a time, use isolation as a form of punishment, or use the threat of isolation to control children's behavior.

---

[2] The National Task Force on Children Exposed to Violence recommends abolishing solitary confinement for youth altogether, as do the American Psychological Association, the American Academy of Child & Adolescent Psychiatry, the American Public Health Association, and the National Commission on Correctional Health Care. The Council of Juvenile Correctional Administrators opposes solitary confinement as punishment and believes that any form of isolation should be for a short time, with supervision. Among the groups that oppose the imposition of solitary confinement for the purpose of punishment, permitting its use only in exceptional circumstances solely when necessary for safety, are the American Correctional Association, American Medical Association, and the National Council of Juvenile and Family Court Judges. *See* Feierman, Lindell and Eaddy, UNLOCKING YOUTH, LEGAL STRATEGIES TO END SOLITARY CONFINEMENT IN JUVENILE FACILITIES, Juvenile Law Center (2017) at 13.

[3] *See* FAQ on SOLITARY CONFINEMENT OF JUVENILE OFFENDERS, available at https://www.apa.org/advocacy/criminal-justice/solitary.pdf. Suicide is the top cause of death among incarcerated juveniles, and a U.S. Department of Justice study found that half of those suicides take place in solitary confinement (https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf). Further, isolation can inflict lasting damage on developing brains and trigger or exacerbate mental illness (https://www.theatlantic.com/health/archive/2014/06/how-solitary-confinement-hurts-the-teenage-brain/373002/). Notably, youth do not attend school when they are relegated to seclusion. Further, solitary practices exacerbate racial disparities, with one study showing that black children are at 68.8% greater odds of being placed in solitary confinement than white children (taking into account controls for predictive factors such as risk to reoffend). Ogle, Megan Rose, THE ROLE OF RACE AND ETHNICITY IN DETERMINING SOLITARY CONFINEMENT PLACEMENTS IN JUVENILE, FACILITIES, Florida State University (2019). Research also shows that LGBTQ children are at heightened risk of solitary confinement. *See* Feierman, Lindell and Eaddy, *supra*, at 14-15; *see also* Association of State Correctional Administrators, AIMING TO REDUCE TIME-IN CELL: REPORTS FROM CORRECTIONAL SYSTEMS ON THE NUMBERS OF PRISONERS RESTRICTED IN HOUSING AND ON THE POTENTIAL OF POLICY CHANGES TO BRING ABOUT REFORMS 55, Yale Law School (2016).

[4] The DCJDC staff appears to frequently request judicial approval of isolation orders that would permit them to keep a child isolated for more than four hours and up to two days. In practice, the DCJDC staff sends a draft of the isolation order to the Juvenile Probation Department. The Juvenile Probation Department then asks a Judge to sign the order without any hearing. According to the allegations reported to us and described above, the terms of the order and regulations were frequently ignored.

The attached affidavits describe many instances of the DCJDC isolating children for days at a time, during which they may be arbitrarily deprived access to mental health counselors.[5] *See* Aff'd N.U. at ¶¶ 19, 20; *see also* Aff'd N.O. at ¶ 11. According to one affidavit, the DCJDC may have kept at least one child in seclusion for several months. Aff'd H.H. at ¶ 20. We were told that, during the pandemic, a twelve-year-old boy was isolated for approximately two weeks due to secondary COVID exposure—he was in contact with an officer who was in contact with someone who had COVID. This occurred even though COVID safety precautions are not consistently followed at the DCJDC.[6] In another instance, a child with mental illness covered herself in her own excrement while in seclusion. "DCJDC ensured that she remained locked in her room for three days without running water and without allowing her to shower." Aff'd. H.H. at ¶ 21.

The Director of DCJDC himself testified at a hearing on January 7, 2021, that situational events can lead to the facility locking residents in their room. At the hearing in question, the situation was that a female resident verbally threatened to slap a guard during a dispute over the facility's policy. Seclusion was used immediately employed as a punitive measure in violation of the Regulations. *See* 55 Pa. Code § 3800.202; *see also* 55 Pa. Code. §§ 3800.212.(c)(3), 3800.274(17)(vii) (requiring that when a facility is restricting a child alone to a room or area, that room or area must have an open door or a window for observation). From this one verbal interaction, the facility sought a court order to extend isolation beyond four to eight hours and up to two full days (48 hours). The Director later explained he didn't know if he actually needed the order, but it was more convenient to request it during the business day in case the order became necessary later.

### Medical Care, Mental Health Care, Education and the Facilities are Unacceptable

Children are denied access to mental health supports and have difficulty accessing medical care. One affiant said, "DCJDC staff can be creative about their reasons for blocking [counselor] access to the kids." Aff'd. N.U. at ¶¶ 22, 23. She also recounted an instance in which medical staff did not believe a child's report of discomfort, resulting in a two-week delay in her receiving care for a subsequently diagnosed disease. Aff'd N.U. at ¶¶ 24-25. One affiant described the medical care as "almost non-existent," commenting that "[a] child could approach the nurses with a glaring injury or illness, and the nurses would still be reluctant to administer Tylenol." Aff'd N.O. at ¶ 14.

Children are denied access to mental health counselors in a fashion that appears arbitrary and, at times, retaliatory. One worker described that "[s]ome DCJDC staff who place these children on unit restriction deliberately withhold mental health services during the unit restriction period. To access these children and provide necessary treatment, I had to learn which DCJDC staff members were most likely to give me permission." Aff'd H.H. at ¶ 24.

The education children receive at the DCJDC appears inadequate. Children receive only two hours of schooling a day. Aff'd. O.R. at ¶ 24; Aff'd N.U. at ¶ 27. One on-site worker described

---

[5] The children nicknamed one staff member "Mr. 23 & 1" for his frequent use of isolation and habit of leaving children locked in their rooms for hours at a time during shift change (the nickname refers to the hours of one day: twenty-three hours isolated and one released).

[6] Delaware County's COVID guidelines for its employees do not require quarantine from secondary exposure.

a one-size-fits-all "curriculum" characterized by 10- and 20- year old residents sitting together in the same classroom completing the same worksheets. Aff'd N.O. at ¶ 12.

The facilities are dirty, in disrepair, and, in some instances, disgusting. We received reports of inadequate water access on residential units, heat that cuts out during winter, rodents, and bug infestations. Aff'd O.R. at ¶ 19; Aff'd N.O. at ¶ 15, 16. One affiant described heat being out for a week during winter. He approached DCJDC leadership and was told nothing could be done to restore the heat, so he filed a Childline complaint about the frigid temperature. Later that same day, the heat returned. Aff'd N.O. at ¶ 16. The food is horrible, undercooked, and insufficient. As a result, the children are often hungry. *See, e.g.*, Aff'd O.R. at ¶ 25.

### Culture of Secrecy

Children opt not to report abuse for fear of retaliation by staff. *See, e.g.*, Aff'd N.U. at ¶¶ 6, 11. ("Often, children beg me not to report to authorities the abuses that take place inside DCJDC. The children are afraid that a report will result in retaliation and only make circumstances worse for them."). Both the staff and the children are aware of the areas in the facility covered by security cameras, and the areas not covered by cameras. The allegations of violence described to us occurred in areas that were off camera, where the children were most vulnerable, and both the child and staff member knew it.

Staff and supervisors are alleged to thwart reporting of abuse. *See, e.g.*, Aff'd. N.O. at ¶ 17. We were told by a person who fears retaliation when there is an incident involving force at DCJDC, staff will at times coordinate their stories with one another.

Abused children have been told no one would believe their claims. The former Lead Clinician witnessed residents credibly alert a supervisor about verbal threats by overnight staff. The supervisor responded, "Do you really think a judge is going to believe a bunch of juvenile delinquents over a corrections officer?" Aff'd O.R. at ¶ 16. Another licensed counselor reports video captured some of the abuses described above, but she was told by multiple staff members that videos are hidden from investigators or ignored. Aff'd H.H. at ¶ 16.

When on-site workers do make Childline reports, they are instructed to inform by email a long list of colleagues, supervisors, facility leadership, and probation authorities.[7] Aff'd O.R. at 26; Aff'd N.O. at ¶ 18. Some colleagues request a "heads-up" before reports are made. Aff'd N.O. at ¶ 18. Those who report incidents to Childline are met with hostility, such as getting the silent treatment, being denied access to children for administering mental health services, and other unpleasant behaviors. Aff'd O.R. at ¶ 30. DCJDC leadership "appeared to handpick kids and coach their interactions with investigators. Leadership would then reward the children with bags of candy." Aff'd N.O. at ¶ 17. In sum, "The DCJDC leadership knows about the problems but is unwilling to address them." Aff'd. H.H. at ¶ 34.

---

[7] CGRC workers are required to notify all supervisors at the DCJDC, the supervisors in the Juvenile Probation Department, the juvenile's probation officer, the juvenile's probation officer's supervisor, as well as nurses and others.

## CONCLUSION

We are deeply concerned for the health, safety and well-being of our clients and all of the children in custody at the DCJDC. We ask you to use all of the investigative tools at your disposal to conduct a complete and thorough investigation into the allegations in this letter. Our children deserve nothing less.

Respectfully,

Christopher Welsh
Defender

Lee Awbrey
First Assistant Public Defender
Delaware County Office of the Public Defender

Cc: Hon. Kevin P. Kelly
    Delaware County Council:
        Brian Zidek (Chair)
        Dr. Monica Taylor (Vice Chair)
        Kevin Madden
        Christine A. Reuther
        Elaine Paul Shaeffer
    District Attorney Jack Stollsteimer
    First District Attorney Tanner Rouse
    William F. Martin, Solicitor

## AFFIDAVIT OF HELEN HALL

I, Helen Hall, hereby declare, verify and swear as follows:

1. My name is Helen Hall.

2. I have a Bachelor's Degree in Psychology from East Stroudsburg University and a Master's Degree in Counselor Education from Marywood University.

3. I am a licensed professional counselor in the Commonwealth of Pennsylvania.

4. I previously worked as a Counselor Advocate at the Victims Intervention Program and for 11 years as a counselor with private and parochial schools in Philadelphia.

5. From June 2016 until July 2020 I worked mostly as the lead clinician at the Delaware County Juvenile Detention Center ("DCJDC") through the Child Guidance Resource Center ("CGRC") based in Havertown, PA.

6. The CGRC is a private non-profit organization that contracts with Delaware County to provide mental health services at the DCJDC.

7. Throughout my time at the DCJDC, I found myself meeting a new resident and asking, "Why is this child even here?" Though some of the children stood accused of violent offenses, I met other children charged with non-violent transgressions, such as truancy.

8. At times it seemed impossible for children to get off juvenile probation in Delaware County, so they would often land back at the DCJDC for relatively trivial violations of supervision. These included missing curfew and travelling outside the permissive bounds of an electronic home monitor.

9. Authorities sometimes cited "safety reasons" for why a child needed to be housed at the DCJDC. For instance, a boy was held at the DCJDC because he was a recent shooting victim. In another case, the Delaware County District Attorney's

Office ensured that a juvenile rape victim remained at the DCJDC, ostensibly because the accused party might attempt to harm her if she was free in the community. Another boy found himself at the DCJDC for a couple weeks, solely because video surfaced of gang members attacking him.

10. Sometimes a kid would be incarcerated at the DCJDC for no reason other than the Juvenile Court's assertion that there was nowhere else to place her.

11. While at the DCJDC, I witnessed and received credible accounts about practices, policies, and conduct against children by DCJDC staff that are violent, abusive, inhumane, inappropriate, and otherwise troubling.

12. In late Spring or early Summer of 2020, a child who suffers from severe mental illness attempted to asphyxiate herself by swallowing her clothing. After DCJDC staff removed the clothes, the child was thirsty and requested water. Three staff members brought the child to a nearby toilet, stuck her head in the bowl, and forced her to drink from it. Later that week, the child shared with me what happened to her. I found her story credible and made a Childline complaint.

13. In Winter 2019-2020, another child entered my office with a black eye. The child did not have a black eye during intake procedures only a couple days prior. The child would not tell me how he suffered the black eye. His juvenile probation officer investigated the incident and determined that one of the larger DCJDC staff members, K.E., punched the child in the face.

14. During the Summer of 2016, a child got into a relatively benign disagreement with a DCJDC supervisor, C.T., in the facility's gymnasium. The child credibly insisted to me he had not been disrespectful. Regardless, as multiple members of the DCJDC staff watched on, the supervisor violently shoved the child into a wall. A DCJDC staff member later corroborated the child's account.

15. The same supervisor – who I referred to as "The Hulk" due to his size and violent temper – had a habit of unnecessarily escalating conflict with the children. In one example, I witnessed the supervisor storm toward a child, get in his face, and

2

threaten, "I'll see you on the street. I'll beat you up. I'll take care of it." I believe the supervisor refrained from physically assaulting the child only because I was present.

16. Surveillance video captured some of these abuses by DCJDC staff. I received credible accounts from multiple staff members that these videos are routinely hidden from investigators or ignored.

17. I am aware of at least one instance in which a DCJDC staff member in late 2020 or early 2021 sent inappropriate messages via the social networking site "Instagram" to a child following her release from the facility.

18. I was appalled at the DCJDC's use of "seclusion" as a means for punishing children. Seclusion is particularly harmful for kids who suffer from mental illness. The practice involves locking a child in a room – sometimes without bedding – for days or even weeks at a time.

19. It has always been my understanding that a court order is necessary before the DCJDC can impose seclusion, and that order must prescribe a finite length of time. The procedures demand that a nurse check on the child at certain intervals during the seclusion period. In defiance of these guidelines, DCJDC staff would impose seclusion against children without a court order, or they would extend seclusion beyond the time prescribed in the order. I do not know whether the DCJDC complied with the nurse check requirements.

20. I believe that the DCJDC staff might have kept at least one child in seclusion for several months.

21. In November or December of 2020, as a manifestation of a child's mental illness, she once became covered by her own excrement while in seclusion. DCJDC ensured that the child remained locked in her room for three days without running water and without allowing her to shower.

3

22. The DCJDC staff also imposes "unit restriction" as punishment.  Unit restriction consists of confining a child on his or her unit and prohibiting the child from visiting the cafeteria, gymnasium, and classroom.

23. The handbook limits unit restriction to 3-day periods.  However, I know that at least one child remained on unit restriction for several weeks, if not months.

24. Mentally ill children are not exempt from unit restriction.  Some DCJDC staff who place these children on unit restriction deliberately withhold mental health services during the unit restriction period.  To access these children and provide necessary treatment, I had to learn which DCJDC staff members were most likely to grant me permission.

25. Children on unit restriction are not permitted to make any phone calls.

26. Children not on unit restriction are permitted only one phone call per week. Though a child on unit restriction can reach his probation officer or paid lawyer any time, a child represented by the Delaware County Public Defender's Office is permitted to call his lawyer only the day before and the day of the child's trial.

27. I was left with the impression that the Juvenile Division of the Delaware County Public Defender's Office had shared interests with the Department of Juvenile Probation, and any attempt to alert a public defender about the abuses occurring at the DCJDC would accomplish nothing.

28. The DCJDC staff mistreats transgender children.  I witnessed staff refuse to refer to children by their preferred pronouns, deny a transitioning girl's request to shave her face, and reject yet another trans girl's request to wear a wig.  A staff member, C.J., told me that the DCJDC leadership forbid staff members from attending a training, offered for free by the state, teaching transgender cultural competency.

29. The DCJDC is unsanitary.  I saw mouse droppings, spiders, and ants.  Children described finding small, winged insects that would emerge from their sink drains.

4

30. The DCJDC experiences frequent heating issues in winter. The facility can get so cold over a long weekend that the children can see their breath. When this happens, the DCJDC staff wears winter coats, hats, and scarves inside the facility. The children, by contrast, are not given winter clothing.

31. The children at the DCJDC do not have adequate access to clean drinking water. The only water fountain at the facility is located outside the gymnasium. There are no water fountains on the residential units. The DCJDC staff ignored my requests to make water pitchers available for the children. This is particularly problematic for children who take medication for mental illness, because these medications tend to have side effects including dry mouth.

32. The food served at the DCJDC is unacceptable. Kitchen staff do not observe sanitary guidelines. Children report that they are hungry. Sometimes, the DCJDC runs out of a scheduled hot meal, and the children are left to eat peanut butter and jelly or cheese sandwiches. The DCJDC will not accommodate children who are vegetarians.

33. The DCJDC's building is in deplorable condition. Toilets back up, and the showers do not drain properly. Children report standing in ankle deep water. One unit was without hot water for months. The DCJDC staff rejected a child's request to shower on another unit and instead forced her to shower in cold water.

34. The leadership at the DCJDC is fully aware of the problems outlined above, but they are unwilling to address them.

35. The CGRC has limited interest in addressing these abuses. The CGRC depends on its friendly relationship with the Delaware County Department of Juvenile Probation. If CGRC exposed the rampant abuses at the DCJDC, it would antagonize Juvenile Probation and potentially cost the CGRC its lucrative contract with Delaware County.

36. I cannot provide a precise number, but I believe I made at least 20 attempts – and maybe as many as 50 – to contact Childline and report these abuses. Every attempt proved fruitless.

37. The DCJDC is not conducive to the treatment and rehabilitation of children. The facility is actively harmful to a child's physical, emotional, and psychological health.

38. Before signing this Affidavit, I had an opportunity to review it and ensure its accuracy.

I hereby swear that the facts set forth above are true and correct to best of my personal knowledge, information and belief, subject to the provisions of Section 4904 of the Pennsylvania Crimes Code pertaining to Unsworn Falsification to Authority.


_____
Helen Hall

_____
3/11/21
Date


_____
Witness

_____
3/11/21
Date

6

## AFFIDAVIT OF OLIVIA ROSENBERGER

I, Olivia Rosenberger, hereby declare, verify and swear as follows:

1.  My name is Olivia Rosenberger.

2.  I have a Master's Degree in Clinical Mental Health Counseling from Rider University.

3.  I am a Licensed Professional Counselor in the Commonwealth of Pennsylvania.

4.  From April 2018 until October 2019 I worked as a Counselor and Advocate at Montgomery County's Victim Services Center.

5.  From October 2019 until December 2020 I worked as a clinician at the Delaware County Juvenile Detention Center in Lima ("DCJDC") through the Child Guidance Resource Center ("CGRC"), which is based in Havertown, PA.

6.  By the end of my time at DCJDC, I worked as the Lead Clinician.

7.  During my employment with CGRC, I witnessed and received credible accounts about practices, policies, and conduct against children by DCJDC staff that are violent, abusive, inhumane, illegal, inappropriate, and otherwise troubling.

8.  One day in March 2020, I walked onto a unit and heard a child screaming my name. As I approached the room where she was located, two DCJDC staff members stood idle outside, apparently unalarmed. When I entered the room, I observed t-shirts and other clothing wrapped tightly around her neck. Her face lost color and veins protruded from her neck. She screamed that she did not want to die. I attempted to remove the t-shirts, but they were so tight around her neck that I was unable to insert my finger between the clothing and her skin. I called out for someone to retrieve scissors, and I managed to cut away the clothing so the child could breathe. Staff eventually took her to the hospital. I reported this incident to ChildLine and notified my supervisor.

9. On a different occasion, another child reported to me that a guard punched her. I observed multiple bruises on the child's face. I reported this incident to ChildLine and notified my supervisor.

10. During the Summer of 2020, I received a credible report from a child that male staff at the DCJDC came on to her in a sexual manner. The child refused to name the offending staff members because she feared retaliation from staff.

11. DCJDC staff have attempted to initiate inappropriate encounters with children after their release from DCJDC. In one instance, for example, a DCJDC staff member, L.G., attempted to contact a former female resident via the social networking site Instagram.

12. Many children reported to me that a staff member nicknamed "Big Rob" makes them uncomfortable. Big Rob once played a song by R & B singer R. Kelly – who faces a variety of criminal charges alleging he sexually abused children – and chased a child around the DCJDC repeating, "I'm gonna get you!" The incident resulted in a Childline complaint, and DCJDC leadership separated Big Rob from that child. Big Rob, however, remains employed at the DCJDC.

13. Due to staff shortages, male guards are assigned to supervise female children. Many of these children are victims of past sexual violence. Even when the guards do not engage in inappropriate behavior, merely having male guards can be traumatizing for the children.

14. Last year, I observed a DCJDC supervisor, C.T., call a child a "bitch."

15. I was present in July 2020 when a child credibly reported to DCJDC supervisors that an overnight worker threatened him on multiple occasions to "fuck you up" and "fuck your mom."

16. When a child asserted intentions to report the DCJDC staff's misconduct, the supervisor, C.T., responded, "Do you really think a judge is going to believe a bunch of juvenile delinquents over a corrections officer?"

2

17. As punishment, DCJDC staff often hold children in seclusion for days at a time. The longest period of seclusion I am aware of lasted approximately one week.

18. During the COVID-19 epidemic, the DCJDC did not employ best practices for public health. From February through December 2020, I am aware of only two occasions on which cleaners sprayed facilities with antibacterial solution. Despite a staff member's COVID-related death and multiple positive tests at the DCJDC, staff did not provide hand sanitizer to children until they filed grievances.

19. The facilities at DCJDC are ravaged by mice, ants, spiders, and dead bees. Certain rooms are left uncleaned for weeks or months at a time. I recall seeing a toilet in December 2020 filled with trash and brown water. The toilet appeared as though it had been untouched for years.

20. Nurses at DCJDC are reluctant to grant children requests for medical treatment. I would have to follow up on a child's visit to ensure that the nurses provided necessary care. One resident asked on multiple occasions to have an STD test completed, since she was having symptoms. I had to follow up with the nursing staff a number of times before they had the resident tested.

21. DCJDC staff will deny children scheduled recreation time outdoors.

22. DCJDC staff withhold mail from children who the staff, by their own admission, dislike. They tell the children they will receive withheld mail upon discharge.

23. DCJDC staff routinely discuss confidential information about children and their respective cases in public areas, such as the facility's lobby, and in front of other children.

24. Education and programming is inadequate at DCJDC. It is my understanding that children used to be taught at different grade levels but now, regardless of age and education level, all children are taught at a fifth-grade level. As a result, older and more advanced students quickly become bored and act out. I saw the Individualized Education Plan of a resident and it was clear to me that it was not being implemented.

3

25. Meals contain small portions, and children are often hungry. During COVID, opportunities to supplement meals – with peanut butter and jelly sandwiches or salad bar access – have been limited. Children report food that is undercooked.

26. The leadership at DCJDC is fully aware of the abuses I recounted above. CGRC leadership instructed us that anytime we filed a Childline complaint we had to notify a long list of fourteen people, plus all supervisors, plus all nurses, the child's probation officer, and that probation officer's supervisor (in addition to the Director of Juvenile Probation and several other probation supervisors).

27. I have witnessed poor treatment of LGBT youth at the DCJDC – particularly transgender children. In one example, DCJDC staff outed a transgender child to other children. The female resident began to grow facial hair back during her stay at detention. Other residents made fun of her, but she was not given the opportunity to shave. Another resident was not allowed to live on the unit or wear the uniform that was consistent with her gender identity.

28. DCJDC staff once threatened a child with seclusion for wearing a Muslim head covering, because staff objected to its color.

29. During my time at DCJDC, I initiated repeated attempts to report the abuses outlined above. I made several calls to Childline, CGRC's Human Resources department, and my supervisors. To the best of my knowledge my concerns were repeatedly dismissed as "unfounded." At best, while investigation into a report of abuse was pending, the offending DCJDC staff member was temporarily separated from the victimized child. As soon as my complaint was disposed of, the offending staff member would often regain access to the victimized child.

30. DCJDC staff retaliated against CGRC employees for making Childline reports by giving them the silent treatment, behaving unpleasantly, and denying counselors access to the children for administering mental health services. Some DCJDC staff members ask CGRC employees for a "heads up" if they intended to file a Childline complaint.

4

31. At the insistence of Delaware County Juvenile Probation, at least one CGRC psychiatrist would amend psychiatric reports – reports intended for use by the Juvenile Court – to help achieve Probation's desired result.

32. This type of pressure also came from the CGRC's leadership. They repeatedly told CGRC staff to not "rock the boat" and specifically warned us against cooperating with the Public Defender's Office. CGRC supervisors explained that it was critical for the CGRC to maintain a friendly relationship with the Office of Juvenile Probation, which has influence over whether the CGRC maintains its lucrative contract with Delaware County.

33. J.M., a member of CGRC's leadership, directly told me that he pressured a CGRC psychiatrist into rewriting a report to conform with Juvenile Probation's wishes. I reported the incident to CGRC's Human Resources Department. Within an hour of making the report, CGRC's Vice President called me and claimed J.M. had done nothing unethical.

34. I decided to leave DCJDC and CGRC when it became apparent that it would be impossible from the inside to put a stop to their wrongdoing.

35. DCJDC is not conducive to the treatment and rehabilitation of children. The facility is harmful to a child's physical, emotional, and psychological health.

36. Before signing this affidavit, I had an opportunity to review it and make any amendments, additions and deletions that I deemed appropriate and/or necessary to ensure the affidavit's accuracy.

I hereby swear that the facts set forth above are true and correct to best of my personal knowledge, information and belief, subject to the provisions of Section 4904 of the Pennsylvania Crimes Code pertaining to Unsworn Falsification to Authority.

_Olivia Rosenberger_
Olivia Rosenberger

03/11/2021
Date

_Witness_
Witness

03/11/2021
Date

5

## AFFIDAVIT OF NATHAN ORIANS

I, Nathan Orians, hereby declare, verify and swear as follows:

1. My name is Nathan Orians.

2. I obtained a Bachelor's Degree from Vassar College and a Master's Degree in Social Work from Smith College.

3. I am in my third year at Drexel University, Thomas R. Kline School of Law.

4. I previously interned with the Counseling Services Department at Bard College providing direct counseling to students.

5. From November 2016 until July 2018, I worked as a clinical case manager at the Delaware County Juvenile Detention Center ("DCJDC") through the Child Guidance Resource Center ("CGRC") based in Havertown, PA.

6. During my time at DCJDC, I witnessed and received credible accounts about practices, policies, and conduct against children by DCJDC staff that are violent, abusive, inhumane, inappropriate, and otherwise troubling.

7. On one occasion, a DCJDC staff member had an argument with a child between the age of 12 and 14. The staff member put the child's head through a window lined with metal wire mesh. The child's head cracked the window, even though this type of window is specifically designed not to break.

8. Another child told me that a DCJDC staff member named "A.J." picked a fight with him that lasted approximately one hour. The altercation began when A.J. shoved the child. A.J. grew increasingly violent. As the altercation concluded, A.J. slapped and / or punched the child.

9. On another occasion, a child threatened to kill himself. In response, the DCJDC was supposed to closely monitor the child one-on-one. Nonetheless, the child somehow managed to create a noose in his room. Staff had the child involuntarily

1

committed at a hospital. Thereafter, I repeatedly found myself in heated arguments with the DCJDC staff about its refusal to follow suicide protocols.

10. Children told me they felt like they had no choice but to escalate behaviors to obtain mental health services. For example, one child was desperate for mental health treatment. When the DCJDC ignored the child's requests, the child felt compelled to smear feces all over the walls of his room. I watched the DCJDC staff escort the shackled child away.

11. The DCJDC routinely places kids in isolation as punishment. I witnessed these periods of isolation last for multiple days. During isolation, the child is locked in an individual room with a toilet, sink, and a concrete bed. A mattress goes on the concrete bed, sometimes without a pillow. If a child in isolation suffers a psychotic episode, some DCJDC staff members withhold mental health services and opt not to inform CGRC counselors.

12. The DCJDC does not offer meaningful education or programming. School consists of a one-size-fits-all "curriculum" characterized by 10- and 20-year-olds sitting together in the same classroom and completing the same worksheets.

13. The DCJDC staff lacks cultural competency. One time, they refused to believe that a Spanish-speaking child could not understand English. Staff handled the situation by yelling at the child in English.

14. The medical care offered at the DCJDC is almost non-existent. A child could approach the nurses with a glaring injury or illness, and the nurses would still be reluctant to administer Tylenol.

15. DCJDC is infested with bugs. One time, a raccoon somehow got into the kitchen.

16. There were always problems with the DCJDC's heating. During the second winter I worked at the DCJDC, the heat did not work for a week. When I approached the DCJDC's leadership and asked why the heat had not yet been restored, I was told there was nothing that could be done about it. In response, I

filed a Childline complaint about the frigid temperature. Later the same day, the heat turned back on.

17. I made reports to Childline and child services multiple times about types of abuses described above. The DCJDC's leadership knows about the problems but is unwilling to address them. The leadership is kept physically separate from the areas of the DCJDC where the abuses occur. The only time I saw leadership interacting with children was when an investigation or audit loomed from an outside agency. The DCJDC leadership appeared to handpick kids and coach their interactions with investigators. Leadership would then reward the children with bags of candy.

18. The CGRC requires its employees to alert DCJDC staff before filing a Childline complaint, which allows offending staff members to prepare explanations and combat accusations of wrongdoing. I submitted some anonymously. Unfortunately, this did not result in more effective responses to DCJDC abuses from child services.

19. The DCJDC's rampant mistreatment of children had a substantial and detrimental impact on my life. I developed my own mental health issues and struggled to sleep. I ultimately quit the CGRC and enrolled in law school so I can expose and correct abuses that occur in places like the DCJDC.

20. The DCJDC is not conducive to the treatment and rehabilitation of children. The facility is actively harmful to a child's physical, emotional, and psychological health.

21. Before signing this Affidavit, I had an opportunity to review it and ensure its accuracy.

3

I hereby swear that the facts set forth above are true and correct to best of my personal knowledge, information and belief, subject to the provisions of Section 4904 of the Pennsylvania Crimes Code pertaining to Unsworn Falsification to Authority.

Nathan Orians

Witness

3/12/21
Date

3/12/21
Date

4

## AFFIDAVIT OF NATALIE ULLMANN

I, Natalie Ullmann, hereby declare, verify and swear as follows:

1. My name is Natalie Ullmann.

2. In 2018, I graduated from The Catholic University of America with a Bachelor's Degree in Psychology. In 2020, I graduated from Temple University with my Master's Degree in Social Work.

3. Since July of 2020, I have been employed with the Child Guidance Resource Center ("CGRC") as a Mental Health Clinician at the Delaware County Juvenile Detention Center ("DCJDC"). As of this affidavit's writing, I remain employed at the DCJDC.

4. While at the DCJDC, I have witnessed and received credible accounts about practices, policies, and conduct against children by DCJDC staff that are violent, abusive, inhumane, inappropriate, and otherwise troubling.

5. In early February, 2021, I witnessed a guard unnecessarily grab a 17-year old pregnant girl by the shoulders and scream into her face. They had been in an argument a few moments prior about the girl returning to her room. However, the girl had calmed down well before the guard put his hands on her. While the guard clutched the girl and screamed at her, her feet got tangled and she fell. The girl later denied that the guard pushed her. Regardless, the guard stepped over top of her in a menacing posture as she lay on the ground. He continued screaming at her until other guards intervened and ushered him away. I promptly reported the incident to Childline.

6. The same week, I received credible accounts – from the girl and another child detainee at the DCJDC – that a different guard boasted about her plan to restrain the girl in such a manner as to deliberately induce her to have a miscarriage. The girl was so frightened that she did not want to disclose this to me. She revealed

what the guard said only after the other child witness implored her to do so. I promptly reported this incident to Childline as well.

7. In October 2020, I noticed a child at the DCJDC had a black eye. When I asked how she got it, she said she could not remember.

8. I witnessed DCJDC staff use abusive language toward and about the children. I heard more than one guard call a child a "bitch."

9. Certain members of the DCJDC staff have no apparent concern for the children's well-being. After a child's release, guards say things like, "Don't worry, he'll be back," and "He'll be dead in two weeks anyway," and will refer to a released child as a "faggot" or a "retard."

10. I received credible accounts from boys that DCJDC guards threaten to "fuck you up." I haven't witnessed this, because the guards tend to issue these threats when they are alone with the child behind closed doors.

11. Often, children beg me not to report to authorities the abuses that take place inside the DCJDC. The children are afraid that a report will result in retaliation and only make circumstances worse for them.

12. Recently, I've grown increasingly concerned about the role of the Delaware County Juvenile Probation Office ("JPO") in the treatment of children at the DCJDC. During the week of February 15, 2021, the JPO Director instructed CGRC counselors to supervise a child continuously Monday through Friday, from 10 a.m. until 4 p.m. Additionally, ~~the JPO Director insisted that~~ CGRC [Detention Staff told NU] counselors no longer be permitted to sit with any children and offer support during video court hearings.

13. In the 8 months I've worked at the DCJDC, the JPO Director had never previously intervened regarding a child's confinement conditions or treatment plan, notwithstanding the fact that I've counseled children there with more severe

2

behavioral issues than the girl at issue. The JPO Director's instructions have no basis in clinical best practices, nor is it appropriate given this particular girl's treatment needs and triggers.

14. Moreover, compliance with the directive consumes a substantial amount of the CGRC's time and resources. It not only damages the girl's mental health but effectively deprives other incarcerated children of the CGRC's services. A CGRC counselor cannot treat other kids when her time is occupied for an entire day unnecessarily monitoring this girl.

15. A CGRC colleague confronted the JPO Director via telephone about the directive, questioned its efficacy, asserted that, because of her past trauma, the girl is averse to this type of invasive monitoring, and explained that the time spent forcing conversation with the girl around the clock would be better spent counseling other children. The JPO Director dismissed my colleague's concerns. "There aren't many kids in detention right now, so you guys have the time," the JPO Director said. "You don't have to talk to her, just sit there and watch her." The JPO Director's attitude toward our commitment to counseling children is unprofessional and degrading.

16. I raised concerns about the JPO Director's instructions to my supervisors and Human Resources at the CGRC, because it implicates fundamental social worker ethics. On February 17, 2021, they contacted JPO Director via email asking about her justification for the directive. To my knowledge, as of the signing of this Affidavit, the JPO Director has not responded.

17. I'm relieved that the CGRC leadership is attempting to address this issue with the JPO Director, because clinicians receive constant reminders from the CGRC that the future of its lucrative contract with Delaware County hinges on its friendly relationship with the JPO.

18. Based on the foregoing, I do not believe that the JPO Director's instruction is a good faith effort to facilitate the girl's rehabilitation and ensure her wellbeing.

3

Instead, I believe the JPO Director's only concern in issuing the directive is to generate and document evidence about girl's behavior that, in its view, will reinforce the Juvenile Court's recent decision to place the girl in secure state detention.

19. The DCJDC staff abuses the use of "seclusion" and "unit restriction" as punishments. I've witnessed guards impose seclusion without a court order and for as long as 3 or 4 days. I've also witnessed a DCJDC supervisor, C.T., unilaterally extend a 3-day unit restriction to 8 days without any valid basis.

20. Certain DCJDC staff members prohibit CGRC counselors from accessing children on seclusion to check on their welfare. Other staff members will allow counselors to visit with a child but only by speaking to the child through the bedroom door. Given the presence of other DCJDC guards and supervisors, there is no respect for the child's right to confidentiality.

21. In January 2021, a guard told me that supervisor C.T. falsely alleged that a child threatened self-harm while on seclusion. C.T. used this as a pretext to justify removing the child's bedding from her room. I have reason to believe that the child had not threatened to hurt herself. C.T. took away her bedding only to make her suffer.

22. Even if a child is not on seclusion or unit restriction, some DCJDC staff members prevent CGRC counselors from offering children mental health services. DCJDC staff can be creative about their reasons for blocking access to the kids. For instance, the DCJDC almost never enforces masking protocols during COVID, and its staff normally doesn't care about the appearance of a child's uniform. However, a guard with an axe to grind against a particular child might cancel the child's CGRC counseling session, citing non-compliance with the DCJDC's mask or uniform policy.

23. The DCJDC staff routinely interrupt and prematurely end CGRC counseling sessions with children.

4

24. Children do not receive humane medical care at the DCJDC. For two weeks, nurses refused to believe a child insisting she was experiencing severe discomfort. It turned out the child was suffering from a sexually transmitted disease. The two weeks that the DCJDC withheld treatment could have resulted in severe, long term health problems for the child.

25. I know other girls approached the nurses – one as recently as November 2020 – with a urinary tract infection. The nurses neither administered antibiotics nor provided any other type of treatment.

26. The DCJDC does not provide the children with enough food in terms of portions or nutrition.

27. School and programming are sporadic during COVID. The children typically wake up between 7:30 and 8:00 a.m., at which time they must clean their rooms and eat breakfast. The children go from breakfast to class at 8:30 or 9:00 a.m. One or two days a week, they will then attend some kind of programming for an hour. After a half-hour lunch, the children might attend class for another hour, but the unreliability of the DCJDC's wireless internet and the unavailability of teachers frequently result in one class per day, at most. On average, the children are around the age of 16, but teachers administer the class for everyone at a fifth-grade level. There appears to be no compliance with Individualized Education Plans.

28. For shift change, which takes place from 2:30 to 3:00 p.m., the children are locked in their rooms. For a time, guards were leaving children in their rooms beyond 5:30 p.m. so the guards could watch television in the common areas without interruption. The CGRC demanded counseling time during this part of the afternoon, which put a stop to the guards' practice of unnecessarily isolating the children for prolonged periods every day.

5

29. The boys play Xbox, and the girls have a Wii gaming system.  Nonetheless, the children are mostly bored with nothing constructive to do.

30. The DCJDC is not conducive to the treatment and rehabilitation of children.  The facility is actively harmful to a child's physical, emotional, and psychological health.

31. Before signing this affidavit, I had an opportunity to review it and ensure its accuracy.

I hereby swear that the facts set forth above are true and correct to best of my personal knowledge, information and belief, subject to the provisions of Section 4904 of the Pennsylvania Crimes Code pertaining to Unsworn Falsification to Authority.


_____          _____
Natalie Ullmann                                         Date   3/11/2021


_____          _____
Witness                                                    Date   3/11/21


6

# EXHIBIT B

In Re:               :

                        :     **GRIEVANCE ARBITRATION**

**TERMINATION OF**     :

**HARLAN JOHNSON**     :

## DECISION

Pursuant to Article 19 of the Collective Bargaining Agreement between the County of Delaware and the County of Delaware Public Employees' Association, Local 3107, an Arbitration Hearing was held on January 21, 2011 concerning the termination of Harlan Johnson from the Delaware County Juvenile Detention Center. Upon consideration of said Arbitration Hearing, and the testimony and evidence presented therein, the following are hereby issued as Arbitration Findings:

1.       Harlan Johnson was employed by the Delaware County Juvenile Detention Center as a Detention Officer.

2.       On January 11, 2010, Mr. Johnson was observed using a cellular telephone in the rear of C-1 Stairwell.

3.       Following an investigation of the January 11, 2010 incident, Mr. Johnson was terminated from his employment by letter dated January 19, 2010 from Ronald A. Berry, Director of the Delaware County Juvenile Detention Center.

4.       Mr. Berry found Mr. Johnson to have violated the following sections of Detention Center Policy: Section 3.113(f) ("Absenting one's self without supervisory permission from the customary place of his work assignment"); Section 3.1.15.24 ("Staff not permitted to make or receive personal phone calls"); and Section 3.1.15.25 ("Detention Officers are not permitted to bring cellular phones into the facility").

5.       Mr. Berry based his decision to terminate Mr. Johnson due to a prior incident on May 13, 2006, wherein Mr. Johnson's employment was terminated for Mr. Johnson's abandonment of his duty station.



EXHIBIT

tabbies

A

6.     The May 13, 2006 incident proceeded to Grievance Arbitration before the Honorable Edward J. Zetusky, Jr.

7.     By Decision dated December 11, 2006, Judge Zetusky set-aside Mr. Johnson's employment termination, and went on to state, "In the future, if Harlan Johnson absents himself from his assigned duty station, for any reason, without permission, he will be subject to immediate termination".

8.     The Parties stipulated that Judge Zetusky's December 11, 2006 Decision gave Mr. Johnson a "last chance".

9.     The issues in the instant matter are as follows: (1) Whether Mr. Johnson was using his cellular telephone?; and (2) Whether Mr. Johnson, in using his cellular telephone, absented himself from the customary place of his work assignment without supervisory permission?

10.    As to Issue #1, the surveillance video presented unequivocally showed Mr. Johnson using his cellular telephone for a period of approximately five minutes and forty seconds.

11.    As to Issue #2, Mr. Johnson may have stayed within the confines of the "C-1 Unit", however, the surveillance video clearly showed that Mr. Johnson left the place of his work assignment.

12.    Mr. Johnson did not have supervisory permission to use his cellular telephone and proceed to the "C-1" stairwell / storage area.

13.    Mr. Johnson is found not to be credible as to whether he could see the juveniles he was assigned to supervise while using his cellular telephone.

14.    Mr. Johnson showed a clear understanding that the December 11, 2006 Decision of the Honorable Edward J. Zetusky, Jr. gave him a "last chance".

15.    A Detention Officer leaving one's assigned position creates a dangerous condition for the juveniles and the other employees of the Detention Center.

16.     Thus, Harlan Johnson is found to have absented himself from his assigned duty station without supervisory permission.

Based upon the foregoing, the following **DECISION** is hereby entered:

**AND NOW**, this 2ND day of **FEBRUARY, 2011**, upon consideration of the Grievance Arbitration held on January 21, 2011, and the evidence and testimony presented therein, the January 19, 2010 termination of Harlan Johnson, from the Delaware County Juvenile Detention Center, is hereby **AFFIRMED.**

CHAD F. KENNEY, SR., JUDGE



### COURT OF COMMON PLEAS

**DELAWARE COUNTY**

THIRTY - SECOND JUDICIAL DISTRICT

COURTHOUSE

MEDIA, DELAWARE COUNTY, PENNSYLVANIA

19063

KENNETH A. CLOUSE
PRESIDENT JUDGE

**JUDGES**
FRANK T. HAZEL
HARRY J. BRADLEY
MAUREEN F. FITZPATRICK
ROBERT C. WRIGHT
JOSEPH P. CRONIN, JR.
PATRICIA H. JENKINS
EDWARD J. ZETUSKY, JR.
JAMES F. PROUD
GEORGE A. PAGANO
ANN A. OSBORNE
CHARLES B. BURR, II
KEVIN F. KELLY
KATHRYNANN W. DURHAM
BARRY C. DOZOR
CHAD F. KENNEY
MICHAEL F.X. COLL
JAMES P. BRADLEY
JAMES F. NILON, JR.

SENIOR JUDGES
WILLIAM R. TOAL, JR.
CHARLES C. KEELER
GEORGE KOUDELIS

**(610) 891-4221**
FAX: (610) 891-5493

December 11, 2006

George Sacharian
AFSCME Representative
3031 Walton Rd.
Suite 300, Bldg. "C"
Plymouth Meeting, PA  19462-2369

Paul D. McNichol, Esquire
Rose Tree Corporate Center I
1400 North Providence Rd.
Box 1210
Media, PA  19063

**Re:   Harlan Johnson**
**Grievance Arbitration**
**Termination of Employment**

Dear Messrs. Sacharian and McNichol:

Enclosed herewith please find a copy of my Opinion and Order in the above, which provides, inter alia, for the following:

- The termination of employment of Mr. Johnson is to be vacated.

- For the incident of May 13, 2006, Mr. Johnson is to be given a long term suspension, without pay, until the next opening of a position of detention officer at the Juvenile Detention Center.

- When such position becomes available, Mr. Johnson is to be reinstated with seniority which existed prior to May 15, 2006.



**EXHIBIT**

B

Case 2:11-cv-01766-BMS Document 29-2 Filed 05/27/11 Page 34 of 52

**IN RE:**     **HARLAN JOHNSON**
              **GRIEVANCE ARBITRATION**
              **TERMINATION OF EMPLOYMENT**

## OPINION

Prior to May 15, 2006, Harlan Johnson (Grievant) had been a detention officer at the Delaware County Juvenile Detention Center (Center) for approximately the preceding 12 years. By letter dated May 15, 2006, Ronald A. Berry (Berry), Director of the Center, informed the Grievant that he was being terminated from his position for his absence from his assigned duty station on May 12, 2006. **(Co. 4 & Union 1)**[1]

The Grievant is a member of the American Federation of State, County and Municipal Employees, District Council 88 (AFSCME), and on May 19, 2006, AFSCME filed a grievance on behalf of the Grievant. **(Union 2)**

The grievance procedure is set forth in Article 19 of the Collective Bargaining Agreement (CBA) between the County and AFSCME. (See **Joint 1**)  Pursuant thereto, each of the first three (3) steps provided for therein resulted in the affirmation of the termination of the Grievant's employment.

This matter came before the undersigned as a result of the agreement of the County and AFSCME pursuant to Section 4 of Article 19 of the CBA.  The undersigned held a hearing on October 19, 2006 and the following persons represented the parties:

- Paul D. McNichol, Esquire represented the County.
- George Sacharian represented AFSCME.

---

[1] The date on which the Grievant absented himself from his assigned duty station was May 13 and not May 12 of 2006.

The above persons agreed to the sequestration of all witnesses.

The County presented three (3) witnesses in support of the Grievant's termination, to wit, Berry and two (2) employees of the Center who witnessed the Grievant's actions on May 13, 2006.  The County had five (5) exhibits marked for identification,  and all were admitted into evidence without objection. (**Co. 1 through Co. 5**)

On behalf of the Grievant, AFSCME presented the stipulated testimony of Michelle Harris and the verbal testimony of the Grievant and another detention officer at the Center.  AFSCME had nine (9) exhibits marked for identification, and all were admitted without objection. (**Union 1 through Union 9**)

After review of all the testimony and evidence presented at the hearing in this matter, the undersigned makes the following Findings of Fact relative to his inquiry:

- At all times relevant hereto, Berry has been the Director and Person-in-Charge of the Center.

- Prior to May 13, 2006, the Grievant had been employed as a Detention Officer at the Center for approximately the preceding twelve (12) years.

- The only evidence presented by the County of prior discipline against the Grievant was a thirty (30) day suspension imposed by Berry for the Grievant's absence from his assigned duty station on February 11, 2000. AFSCME intervened on behalf of the Grievant and the suspension was reduced to five (5) days and the Grievant signed a written statement providing, inter alia, that "any future occurrence similar to this infraction will result in immediate termination." (**Co. 5, Union 8 & Union 9**)

- On May 12, 2006, Grievant began the third shift at the Center which began at 11:30 AM and ended at 7:30 AM on May 13, 2006.

2

- At approximately 2:30 AM on May 13, 2006, a young lady, identifying herself as Michelle, came to the Center and asked for admission so that she could talk to the Grievant.

- The Control Center operator allowed Michelle to enter the lobby of the Center by buzzing her through several gates **without** obtaining her full identification or the basis for her visit.

- The Control Center operator called the Grievant's supervisor who met Michelle in the lobby of the Center. Michelle again asked to see the Grievant without fully identifying herself or giving the reason for her visit.

- Grievant's supervisor, without questioning Michelle, summoned the Grievant to the lobby. When the Grievant arrived in the lobby, the supervisor left without further conversation with either Michelle or with the Grievant.

- The Grievant and Michelle talked for a short period of time in the lobby. They then went to the door to go outside without saying anything to the Control Center operator. The operator opened the door to allow them to go outside without any conversation and did not contact the Grievant's supervisor.

- The Grievant and Michelle talked for a while outside the door to the lobby and then approached a gate to the parking lot. Without any conversation, the Control Center operator opened the gate to allow them to go into the parking lot area.

- Though the Grievant was not allowed into the parking area without authorization, the Control Center operator opened the gate to allow the Grievant and Michelle to go into the parking lot area without any conversation and without contacting the Grievant's supervisor.

- The Grievant and Michelle talked in the parking lot area for a while, and then, at approximately 3:00 AM, they entered Michelle's car.

- Michelle's car was in view of a security camera of the Center, which fact was known to the Grievant.

- Sometime thereafter, the Control Center operator advised the Grievant's supervisor of the Grievant's above actions.

- The Grievant and Michelle could be seen talking in the car and at times the Grievant was hugging and kissing Michelle.

3

- Approximately 3:45 AM, the Grievant came back into the lobby of the Center to go to the men's room, then he proceeded back to Michelle's car. The Control Center operator opened the outside gate and the lobby door to allow the Grievant to enter and exit without any communication with the Grievant and without further contact of the Grievant's supervisor.

- After the Control Center operator advised him that the Grievant was in Michelle's car, the Grievant's supervisor, from time to time, came to the Control Center operator's position to view the video of the Grievant and Michelle in the car but took no action to have the Grievant return to his duty station.    Grievant's supervisor merely told the Control Center operator to keep taping the actions of the Grievant in Michelle's car.

- At approximately 4:12 AM, the Grievant came back and resumed his duties as a detention officer.

- The Grievant's assigned duty station was a unit containing sixteen (16) juveniles which required two (2) detention officers.  This fact was known to the Grievant.

- The Grievant had never asked permission from his supervisor to leave the building and to stay away from his assigned duty station for a period of approximately an hour and a half.

- The Grievant's supervisor provided coverage for the Grievant while he was away from his duty station.

- It was stipulated that Michelle was Michelle Harris, the Grievant's cousin, that Ms. Harris came to see the Grievant because her nephew had been involved in an accident, that Ms. Harris had just left the hospital where her nephew was a patient and that the "hugging and kissing" was the Grievant consoling his cousin.

- The Grievant's supervisor received a written reprimand for his actions on May 13, 2006.

- There was no evidence that the Control Center operator received any discipline for his actions.

- The Grievant knew that he was not to leave his duty station without permission.

4

Article 20 of the CBA sets forth the provisions for the discharge or disciplinary action against an employee of the County who is a member of AFSCME. Section 1 thereof provides, in part, as follows:

> "Except as otherwise provided in this Agreement, the Employer shall not discharge or discipline any employee without just cause. Any employee may be subject to an immediate discharge without notice, for any of the following reasons: . . .
>
> > (f) Absenting one's self without supervisory permission from the customary place of his work assignment . . ."

The Grievant's only prior discipline appears to be his absence from his duty station on February 11, 2000. On February 15, 2000, Berry suspended the Grievant for thirty (30) days for such violation. As a result of AFSCME's intervention, the suspension was reduced to five (5) days. However, the reduction was based upon a written agreement of the Grievant that "any future occurrence similar to this infraction will result in immediate termination." (**Co. 5, Union 8 & Union 9**) Berry admitted that his decision to terminate the employment of the Grievant for the May 13, 2006 incident was based upon the foregoing agreement.

The Grievant admits knowing that he cannot leave his duty station without the permission of his supervisor. However, he claims that he does not know that he is prevented from leaving the building without the permission of his supervisor. Such a position is totally inconsistent. If one cannot leave his duty station without permission from his supervisor, it follows that he cannot leave the building in which his duty station is located without permission from his supervisor.

5

On May 13, 2006, the Grievant initially left his duty station as a result of a call from his supervisor. Thus, his initial leaving was with the permission of his supervisor. The supervisor's permission was to allow the Grievant to talk to Michelle in the lobby of the Center.

Common sense would dictate that the foregoing permission did not encompass the Grievant leaving the Center, entering his cousin's car and staying away from his duty station for approximately an hour and a half. The Grievant failed, refused and neglected to have any contact with his supervisor to obtain his approval for leaving the building and for staying away from his duty station for such a long period of time. Also, he did not contact his supervisor to make sure sufficient coverage was provided for the juveniles to whom he had been assigned. If there were no other facts to be considered, a termination would be supported by such evidence.

However, the Grievant was allowed to leave the Center by the Control Center operator not once, but twice. On neither occasion did the Control Center operator question the Grievant or attempt to stop him from exiting the Center. In addition, the Control Center operator did not immediately advise the Grievant's supervisor that the Grievant had left the Center. When the supervisor was made aware that the Grievant was outside the Center, he took no action to require the Grievant to return to his assigned duty. It is interesting to note that the Control Center operator was not disciplined at all and that the supervisor only received a written reprimand.

6

As a result of the foregoing, the Court finds that the imposition of a termination is not warranted and that a long term suspension, without pay, is the appropriate discipline.

**THEREFORE**, the Court enters the following:

# ORDER

**Zetusky, J.**                                        **Filed:** *12-11-06*

**AND NOW,** to wit, this *11th* day of December AD 2006, based upon the

foregoing Findings of Fact and Opinion, it is hereby **ORDERED** and **DECREED** as

follows:

1. The termination of employment of Harlan Johnson is hereby set aside.

2. For the incident of May 13, 2006, Harlan Johnson is suspended, without pay, from May 15, 2006 until the next opening in the position of detention officer at the Delaware County Juvenile Detention becomes available.

3. When the next position of detention officer at the Delaware County Juvenile Detention Center becomes available, Harlan Johnson will be reinstated in employment with all seniority which existed prior to May 15, 2006.

4. In the future, if Harlan Johnson absents himself from his assigned duty station, for any reason, without permission, he will be subject to immediate termination.

                                        **BY THE COURT:**

                                        EDWARD J. ZETUSKY, JR., Judge

2

- In the future, If Mr. Johnson absents himself from his duty station, for any reason, without permission, he will be subject to immediate termination.

The original of the enclosed have been forwarded to John E. Clark, Director of Labor Relations.

Very truly yours,

**EDWARD J. ZETUSKY, JR.,**
**Judge**

EJZJr:mp

Enclosures

cc:   John E. Clark, Director of Labor Relations
      Phillip W. Damiani, Executive Director – Court Services
      Joan A. Kravitz, Deputy Director – Internal Management

# EXHIBIT C

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF PUBLIC WELFARE

# CERTIFICATE OF COMPLIANCE

This Certificate is hereby granted to **DELAWARE COUNTY BOARD OF MANAGERS**
LEGAL ENTITY

To operate **DELAWARE COUNTY JUVENILE DETENTION CENTER**
NAME OF FACILITY OR AGENCY

Located at **370 NORTH MIDDLETOWN ROAD, LIMA, PA  19037**
(COMPLETE ADDRESS OF FACILITY OR AGENCY)

ADDRESS OF SATELLITE SITE                          ADDRESS OF SATELLITE SITE

ADDRESS OF SATELLITE SITE                          ADDRESS OF SATELLITE SITE

ADDRESS OF SATELLITE SITE                          ADDRESS OF SATELLITE SITE

To provide **Secure Detention**
TYPE OF SERVICE(S) TO BE PROVIDED

The total number of persons which may be cared for at one time may not exceed **66**
or the maximum capacity permitted by the Certificate of Occupancy, whichever is smaller.
(MAXIMUM CAPACITY)

Restrictions: _____

This certificate is granted in accordance with the Public Welfare Code of 1967, P.L. 31, as amended, and Regulations

**55 Pa.Code Chapter 3800: Child Residential and Day Treatment Facilities**
(MANUAL NUMBER AND TITLE OF REGULATIONS)

and shall remain in effect from **August 13,**          **2009**   until **August 13,**          **2010** ,
unless sooner revoked for non-compliance with applicable laws and regulations.

No: **119800**

*Robert E. Robinson*
ISSUING OFFICER

DEPUTY SECRETARY

NOTE:  This certificate is issued for the above site(s) only and is not transferable
and should be posted in a conspicuous place in the facility.

PW 628 - 4/02



COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF PUBLIC WELFARE
P.O. BOX 2675
HARRISBURG, PENNSYLVANIA 17105-2675

Richard J. Gold
Deputy Secretary for
Children, Youth and Families

PHONE: (717) 787-4756
FAX: (717) 787-0414

The Honorable Joseph P. Cronin, Jr.
President Judge
Delaware County Board of Managers
370 North Middletown Road
Lima, Pennsylvania 19037

JUL 1 5 2009

> **RE:**   Delaware County Juvenile Detention Center
> 370 North Middletown Road
> Lima, Pennsylvania 19037
> License #119800

Dear Judge Cronin:

As a result of the Department of Public Welfare's Annual Evaluation conducted April 30, 2009 thru June 8, 2009 of the above-named facility, we have noted deficiencies with 55 Pa. Code Chapter 3800 relating to Child Residential and Day Treatment Facilities.  Your plan of correction has been reviewed and approved.  Based on your approved plan of correction a full certificate of compliance is being issued to the above-named site for 55 Pa. Code Chapter 3800 relating to Child Residential and Day Treatment Facilities.

Your copy of the certificate is enclosed.

Sincerely,

Richard J. Gold

Enclosures

cc:  Ronald A. Berry, Director
     Judge Maureen Fitzpatrick

## LICENSING/APPROVAL/REGISTRATION INSPECTION SUMMARY

| NAME OF AGENCY/FACILITY:<br>DELAWARE COUNTY DETENTION CENTER | TELEPHONE:<br>610-891-8660 | OCYF REGIONAL STAFF APPROVAL | DATE |
|---|---|---|---|
| ADDRESS:<br>370 NORTH MIDDLETOWN ROAD  LIMA, PA 19037 | COUNTY:<br>Delaware | *Carol Roberts* | 07/02/2009 |
| INSPECTED BY:<br>Alexander Prattis, Carol Roberts, Richard Walker | INSPECTION DATE(S):<br>04/30/09-06/08/2009 | *Richard Walker* | 07/02/2009 |
| | | *Rhonda Harrison-Northampton* | 5/7/09 |

| INITIAL INSPECTION | RENEWAL INSPECTION | COMPLAINT | UNANNOUNCED INSPECTION | RANDOM SAMPLE |
|---|---|---|---|---|
| | X | | | |

| 1. 55 PA CODE CHAPTER | 2. NON-COMPLIANCE AREA | 3. CORRECTION REQUIRED | 4. REQUIRED CORRECTION DATE | 5. PROVIDER'S PLAN OF CORRECTION OR RESPONSE | 6. STATUS OF CORRECTION |
|---|---|---|---|---|---|
| The Department of Public Welfare's Office of Children, Youth and Families ("Department") conducted its annual licensing inspection of Delaware County Detention Center for the period of review from April 1, 2008 through March 31, 2009.  For this review, the Department reviewed 19 employee records and 50 randomly selected child files, interviewed staff and children receiving care at Delaware County Detention Center, and conducted a walk-through inspection of site. | | | | | |
| 3800.141 (a) | During the review of the child's records it was determined that the agency failed to complete and document the required 24 hour Health and Safety Assessment within the required timeframe. | Please complete a plan to assure that all children in the care of the facility will receive a Health and Safety Assessment within 24 hours as part of their initial intake as per the regulation. Please include a methodology for monitoring the plan. | With 10 days of receipt. | The Shift Supervisor will be responsible to assure the Intake Officer will complete the required 24 hour Health and Safety Assessment on every admission and confirm the document was filed in the child's medical record.  The Assistant Director will review the medical records quarterly to assure compliance. | APPROVED @ 07/02/2009 |
| 3800.84(a) | Ventilation ducts in the main kitchen walk-in freezer and housing unit bedrooms are in need of cleaning or repair.  The accumulation of dust and other foreign debris is restricting quality air | The agency should have a professional air quality evaluations conducted in each bedroom and on all housing units in the facility to ensure the health and safety of children being served, | With 10 days of receipt. | This agency has contracted Connell-Green Consulting, Inc. to perform a background air quality evaluation throughout the facility.  Areas sampled will include representative bedrooms, common  areas and staff rooms throughout each housing unit, common/recreational areas and administration areas.  This evaluation | APPROVED @ 07/02/2009 |

## LICENSING/APPROVAL/REGISTRATION INSPECTION SUMMARY

| | | | | |
|---|---|---|---|---|
| | flow.  The bedroom on each of the housing units appears to be - sealed rooms with little to no outside air flow. | and the employed staff. | | will begin on June 25, 2009.  The report delivery will follow approximately 1 week later.  This agency will review the report and take any and all recommendations and/or necessary steps to ensure the health and safety of children and staff will not be adversely exposed to harmful air pollution/contamination. The results of the completed evaluation will be forwarded to the .D.P.W. Regional Office upon completion. | |

THE LEGAL ENTITY REPRESENTATIVE MUST COMPLETE COLUMN 5, SIGN ON THE SIGNATURE LINE AT THE BOTTOM AND DATE ALL PAGES OF THIS DOCUMENT. RETURN THIS ENTIRE DOCUMENT TO YOUR REGIONAL OFFICE BY:   07/24/2008

*Joseph P. Cronin Jr.*                                          President Judge

SIGNATURE OF LEGAL ENTITY REPRESENTATIVE                    TITLE

6/29/09                                          610-891-5320

DATE                                          TELEPHONE NUMBER

# EXHIBIT D



Listen Live • Here and Now

COURTS & LAW     CRIMINAL JUSTICE     INCARCERATION     SOCIAL JUSTICE

# Following abuse allegations, Delco to create oversight board to lead juvenile detention center

 By Kenny Cooper · May 14, 2021



Delaware County Juvenile Detention Center (Google Maps)

Delaware County Council has announced the creation of a new board to oversee its juvenile detention center that was vacated and closed following a bombshell report in March that alleged "physical, sexual, and psychological abuse" of children and teenagers. With an investigation pending and the potential for litigation, the county is hoping to correct the failures of the past.

"What we on council can do is we can look forward, we can say what ought there be to ensure that Delaware County is a leader in how we deal with juvenile detention and juvenile justice

generally — and creating this oversight board is really a statement of that," Councilmember Kevin Madden said.

The new 10-member board of managers will consist of three councilmembers, the county controller, and six citizen appointments: three chosen by chair of council and three chosen by President Judge Kevin Kelly of Delco's Court of Common Pleas.

The Delaware County Juvenile Detention Center in Lima was previously run by the county court system. This shift to a board of managers is not unprecedented. In fact, the creation of this board would actually bring the county in compliance with state law.

## Related Content



**COURTS & LAW**

**Child advocates call for permanent closure of Delco detention center after abuse allegations**

*5 months ago*

"As the issues at the Lima detention center came to light, we investigated why are things as they are in Delaware County. Why has this been a department that's been overseen directly by the courts?" Madden said. "And what we found is that that was an anomaly — that that's not how it works in some of our neighboring counties."

County council will introduce an ordinance at their May 19 public meeting and could potentially vote on it at their June 2 meeting. The earliest the board of managers could begin their work is June 14.

As for members of the public who are interested in filling the citizen appointments, Madden says that there is no single ideal candidate profile.

"I think we want range. I think we want people who represent differing backgrounds and interests. So I wouldn't say there's any ideal candidate other than having a real passion for this issue," Madden said.

Lee Awbrey, the first assistant public defender at Delaware County's Office of the Public Defender, the office that authored the March report, welcomes the change.

"First of all, it's a great move, because I think any time you have a facility like this, you need a well-balanced team of decision-makers who are going to ensure accountability and provide for transparency. So it's a great shift that is happening," Awbrey said.

She was a part of the team that initially uncovered the abuse claims and, along with chief defender Chris Welsh, sent an urgent letter to the Pennsylvania Department of Human Services detailing allegations committed by staff at the detention center.

### Related Content



**COMMUNITY**

**'They're human beings and should be treated right': Families protest conditions in Philly prison**

*5 months ago*

The number of youth incarcerated at the facility had been steadily declining over the years and there were about a half-dozen children at the site when regional staff from the Office of Children, Youth, and Families arrived to initially investigate. The children were relocated to an undisclosed location and it's unclear when or if the facility will reopen.

Awbrey hopes the new board will meet the moment.

"There's an opportunity to revisit what kind of culture and facility we are creating when we're placing children in secure detention," Awbrey said.

While a lot of that work she says is thankfully "congruent" with the work being done at the state level with Gov. Tom Wolf's Juvenile Justice Task Force, Awbrey believes a deeper question remains: what can Delco do to ensure fewer children end up in a correctional facility?

Awbrey says that many of the youth-involved cases that come across her desk frequently pertain to issues that are not criminal in nature; some children have unstable housing, previous run-ins with the system, or disabilities that aren't getting treated correctly.

"And being removed from the community and placed into a carceral setting adds trauma," Awbrey said.

The county says that members of the public who wish to be considered for selection to the unpaid board appointment can submit an application to DelcoBoards@co.delaware.pa.us.



**Get daily updates from WHYY News!**

The free WHYY News Daily newsletter delivers the most important local stories to your inbox.

Enter your Email here

Subscribe

Share this  

---

## You may also like



**COURTS & LAW**

**6ABC**

**New details emerge in shooting death of 8-year-old girl at Academy Park High School football game**

*5 days ago*



**COURTS & LAW**

**Federal lawsuit accuses Chester Twp., police of civil rights violations in arrests of Black residents for loitering**

*3 weeks ago*

**COURTS & LAW**